2026 IL App (1st) 232181-U

No. 1-23-2181

Order filed June 30, 2026

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CR 03672 01 |
| | ) | |
| KEVIN SABBS, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ODEN JOHNSON delivered the judgment of the court.
Justices Mikva and Wilson concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm and find no abuse of discretion where the trial court admitted other crimes evidence, admitted the deceased victim's prior statement, and overruled defendant's objections to the State's closing arguments.

¶ 2   Defendant Kevin Sabbs appeals his first-degree murder conviction and 40-year sentence after a jury trial for the 2018 murder of Robin Boler. On appeal, defendant contends that he was denied a fair trial based on the following: (1) the trial court allowed the State to present unfairly

prejudicial other crimes evidence of strangulation and the victim's hearsay statements about the big screen television that defendant removed from her apartment with his other belongings; (2) the State made numerous improper closing arguments; and (3) the cumulative effect of the aforementioned errors. For the following reasons, we affirm.

¶ 3                                         BACKGROUND

¶ 4      This case arises from the death of Robin Boler, whose body was found in her apartment by her mother and aunt on August 5, 2018. As defendant has only raised issues pertaining to the admission of other crimes evidence, the victim's statements about a big screen television that defendant ultimately removed from her apartment and the State's closing argument, we will set forth only those facts necessary to address those issues.

¶ 5                      A. State's Motion to Allow Other Crimes Evidence

¶ 6      Prior to trial, on April 29, 2022, the State filed a motion to allow other crimes evidence through the presentation of testimony by three of defendant's former girlfriends about defendant's prior arrests for instances of domestic violence. The motion was amended on June 22, 2022, to include other crimes evidence of domestic violence to a fourth former girlfriend. Specifically, the State sought to admit evidence of other crimes as follows: Heidi Suazo, four incidents; Whitney Hudson, three incidents; Nicole Lewis, one incident; and Whitney Gross, two incidents. The State sought introduction of those other domestic assaults as relevant evidence of defendant's identify, intent, motive, lack of consent, *modus operandi*, common scheme or design, and propensity to commit domestic assaults. The State argued that defendant's attack on the victim in the present case was similar to attacks on the other victims, in that he was in a dating relationship

with the assault victims, he had a verbal argument with the former girlfriends that resulted in physical violence, namely striking them in the face and/or choking them with his hands.

¶ 7    Defendant objected, arguing that the medical examiner's report for the victim contained no findings of strangulation; rather, the report found that the victim's cause of death was homicide by unspecified means. Further, defendant argued that allowing such evidence regarding choking or strangulation would put a fact into the case that was not present or proven by any scientific means and would take away the ultimate fact-finding from the jury. Defendant also asserted that allowing the dissimilar evidence  would deny him a fair trial and challenge its admissibility under the other crimes evidence exceptions.

¶ 8     In response, the State clarified that the medical examiner's report found that, while the victim's cause of death was homicide by unspecified means, asphyxiation could not be ruled out. Further, the State noted that additional discovery yielded reports and conversations with the medical examiner indicating that that the victim's death was in fact due to strangulation, which was the State's theory that the case involved domestic violence. The State argued that the proffered evidence of prior domestic violence situations showed that, defendant, after having a dispute with his romantic partner, would get angry, and his chosen method of resolution was to use his hands. The State further indicated that the medical examiner would be able to testify that it was a homicidal death by someone's hands, and that defendant's DNA was found on the ligatures[1] that bound the victim's body, namely her wrists, ankles and legs. Additionally, the State noted it's theory that the victim's death was the result of domestic violence, and that defendant's former

---

[1] A ligature is anything that serves for binding or tying up, as a band, bandage, or cord. LIGATURE Definition & Meaning | Dictionary.com

romantic partners had experienced domestic violence with defendant including being choked to unconsciousness multiple times or being struck in the face, after arguments. The State argued that there was a consistent pattern spanning almost 15 years where defendant would consistently resolve conflicts with romantic partners using some form of domestic violence, which would go towards motive, and that the prior incidents did not have to be identical, only similar.

¶ 9    After taking the matter under advisement, the trial court issued its ruling on August 4, 2023, noting that it had to consider the facts of the various cases, the proximity of the time or remoteness, the factual similarities, and other relevant facts and circumstances, as well as whether the probative value of the other crimes evidence outweighed the prejudice to defendant. The trial court subsequently allowed portions of the other crimes evidence as follows: the October 13, 2015, and April 25, 2016, incidents for Heidi Suazo; the July 14, 2009, and September 17, 2010, incidents for Whitney Hudson; none for Nicole Lewis; and the Mother's Day 2018 incident for Whitney Gross. The trial court found that the other crimes evidence that it allowed were relevant for propensity, motive and intent.

¶ 10                          B. Defendant's Trial

¶ 11   Defendant's jury trial began on August 14, 2023. Prior to the commencement of jury selection, the trial court heard several motions *in limine*, one of which was related to the ownership of television, which is raised as an issue in this appeal. The State argued that ownership of the television and the victim's LINK card went to motive. The State maintained that the victim's statement regarding the television was being presented not to show ownership of the television, but rather that the victim believed it to be her television and that defendant had no right to it. The State wanted to admit those statements to support its theory of defendant's motive to commit

murder. The State reiterated its theory that defendant went to the victim's house with the intent of taking the television and that the issue was debated between them. The State concluded that the statements regarding ownership of the television and the victim's belief that defendant would try and take the television also went to the victim's state of mind. This belief was the reason she had her friend present to help prevent defendant from taking the television. The trial court found that the evidence regarding the television was relevant and admissible, it was not hearsay as it established defendant's intent, and the television was in fact taken. The trial court denied defendant's motion *in limine* regarding actual ownership of the television.

¶ 12    At trial, the State presented the testimony of Pamela Boler, the victim's mother; Whitney Gross, defendant's ex-girlfriend; Carmen Polk, the victim's best friend; Officer Keith Connolly; Special Agent Jeremy Bauer; Detective Marc Delfavero; Veronica Jackson; Megan Neff; Karen Abbinanti; and Ponni Arunkumar, M.D.

¶ 13    Prior to Boler's testimony, the trial court admonished the jury that evidence will be presented that defendant may have been involved in offenses other than those charged in the present case. The court admonished that such evidence is presented on the issues of defendant's intent, motive, and propensity to commit domestic violence and may be considered by the jury for those limited purposes as it determines whether defendant was involved in those offenses and if so, what weight to give to that evidence on the issues of intent, motive and propensity to commit domestic violence.

¶ 14    Boler testified that she was the victim's mother and that the victim's date of birth was October 1, 1985. The parties stipulated that if Boler was to look at People's Exhibit No. 2, she would testify that it clearly and accurately reflected what the victim looked like in death. Boler

testified that the victim lived in a third floor apartment at 1516 West 78th Street in Chicago, Illinois with defendant and her two children in 2018, and that she had visited her there on several occasions. Boler identified defendant in court as the person who lived with the victim. Boler further testified that she had spoken with the victim on Tuesday, July 31, 2018, via Face Time video call, and they had plans for a weekend ladies' night out, which included two of Boler's nieces. Boler unsuccessfully attempted to reach the victim the following day and several days thereafter via phone, Face Time and Facebook between July 31 and August 5, 2018. Boler stated that the victim generally posted daily on Facebook but there were no posts made between that time.

¶ 15    On Sunday, August 5, 2018, at approximately 6 p.m., Boler again tried to reach the victim but to no avail.  She also reached out to her sister and niece to see if they had spoken with the victim, both of whom noted that the victim had not been on Facebook the entire week. Boler and her sister then went to the victim's apartment building, where she rang several doorbells until someone buzzed her inside, and she went upstairs to the victim's apartment. Prior to entering the building, Boler noticed that the victim's apartment was dark, the air conditioner and a fan were both running, the temperature was in the 90s, and it was hot and humid. Boler's sister made it upstairs first and notified her that the victim's door was unlocked, which Boler stated the victim would never do because she was very conscious about keeping her doors locked. When Boler arrived upstairs, she pushed the victim's door open and immediately noticed that it was dark and freezing cold in the apartment. Boler noticed that the victim's keys, cigarettes, and a drink were on the table after she turned the light on and stated that it was something the victim would not do because she would not go far without her keys. Boler also stated that it was odd for the apartment to be dark because the victim was afraid of the dark and had been so her entire life. Boler also

noticed that the large television was gone from the living room. As she looked around the room, Boler also noticed that the victim's purse and a lock box that contained the victim's "personal papers" were on the couch.

¶ 16 Boler next entered the victim's bedroom and noticed that the bed was made, which was unusual because the victim generally did not make her bed because "she said why make it, I'm going to get back in it." Boler looked inside the victim's closet, which she described as messy, before going to her grandsons' room, where she noticed that their video game was missing. Meanwhile, Boler's sister was coming from the kitchen and indicated that the light would not come on. Boler's sister tried the bathroom door and told Boler that the door was locked. Boler was able to get the bathroom door open and a bunch of flies came out like they were attacking her. She walked inside while looking around and saw that the shower curtain was closed. When she opened it, she saw the victim in the bathtub. Boler testified that her first instinct was to bend down and pick her up but she saw that the victim's hands were tied and decided not to touch her. Boler's sister had a neighbor call the police after indicating that the victim was in there. Boler identified a photograph depicting the victim as she found her in the bathtub with her hands tied. Boler also stated that it was odd that both the air conditioner and fan were on because the victim was cheap, nor would she have the air conditioner on with a window open. Regarding the missing television, Boler indicated that the victim bought it during income tax season and considered it to be her baby. There was no objection made to the testimony.

¶ 17 Boler stated that after finding the victim she called defendant, who was saved in her phone as "Kevin Son," and asked him when he last spoke to the victim, and he stated a couple days ago. Boler asked defendant where he was and he replied, "out west." She inquired whether he still had

keys to the apartment and defendant replied "yes." Boler told him she needed something out of the apartment for work and he stated that he was "out west" and hung up. Boler stated that when she normally spoke with defendant on the phone he was kind and polite, usually saying "hey ma," but this time he was rushing off the phone, which was out of character. Boler testified that she contacted other family members to let them know that the victim was dead and they all came to the victim's apartment. Defendant's brother arrived as the victim's body was being taken from the apartment. However, defendant did not come. Boler spoke with defendant again the following day, when defendant called her from a different number. She did not know who it was initially until defendant spoke and stated that he heard the victim was dead and he hoped that she did not think he had something to do with it. Boler told defendant that she did in fact think he had something to do with it.

¶ 18     Boler further stated that the victim was unemployed during the summer of 2018 and used a Link card to buy food. Boler stated that she had never asked the victim to use her Link card because she knew the victim would not give it to her. Boler was subsequently given the victim's possessions but the Link card was not with them, nor was the victim's most recent phone.

¶ 19     Boler also testified about an incident that occurred on Mother's Day 2018 at a party held at the victim's apartment. Also present were defendant, his mother, his siblings and some children. At some point, the doorbell rang, defendant buzzed the doorbell, opened the door and a young lady that she had never seen before came in. The young lady stayed by the door and defendant went back into the room. The victim saw the young lady and asked her who she was, and the young lady said she would let defendant tell the victim that. The victim was upset, told the young lady to leave her house, and subsequently put the young lady out of her house and locked the door. As the victim

stood in front of the door, defendant stood in front of her. Defendant wanted to go out the door and the victim blocked him. Defendant kept telling the victim to move but she refused, saying that they were going to talk about it and asked who the woman was. Defendant grabbed the victim by her neck and choked her. The victim kept asking defendant to let her go. Everyone present tried to get defendant to let the victim go and the victim subsequently blacked out and slid down to the floor in front of the door. By the time the victim regained consciousness, defendant had already left. No one called the police that day.

¶ 20    On cross-examination, Boler stated that the victim and defendant had been in a dating relationship for two or more years and that he was crying when he called on August 6, 2018.

¶ 21    Whitney Gross testified that in 2018 she was living in Chicago and she identified defendant in court as someone she had a relationship with in 2018. Gross stated that she had known defendant for approximately two and one-half years and dated for six to seven months in 2018, including July and August of that year. Defendant subsequently moved in with Gross and her two children on the west side that summer. Gross identified a photo of herself and defendant that was posted to defendant's Instagram page in 2018 and stated that defendant called her "bae and wifey." Gross did not know the victim but had met her once on Mother's Day 2018 when she went to pick defendant up from what she thought was his apartment. Defendant told Gross what time to pick him up and she did. When she arrived, she called defendant twice and when he did not answer, she rang the doorbell and was buzzed in. Gross could hear the sounds of a party and heard defendant's brother's voice, so she went upstairs. When she arrived at the third floor, someone opened the door and the victim came to the door, which was the first time Gross had ever seen the victim. The victim asked her if she was Whitney Gross and she said yes. The victim asked her if she was there

for defendant and Gross said yes. Defendant then walked to the door and told Gross that she did not need to say anything to the victim. Defendant was very stern when he told Gross that she did not have to say anything to the victim and told her that she was coming. Gross then went back to the car where her children were waiting but heard arguing as she left.

¶ 22 Gross further testified that in August 2018, defendant was living with her in her apartment on the west side and had moved some clothes and a few items piecemeal. On August 1, 2018, Gross left for work at approximately 8:15 a.m., leaving defendant at the apartment, so she was unaware whether or not he went to work that day. Gross communicated with defendant throughout the day, and at approximately 4:30 p.m., he asked her to pick him up from the victim's house so he could get all of his things after work. Gross indicated that she would finish work around 5:30 p.m., and defendant stated that he would let her know when he was ready. Gross told defendant she had to pick up her son at 8:30 p.m. Defendant later messaged Gross and stated that he would be ready in a few so she could start heading that way. Although Gross did not have the exact address, she knew that defendant's mother lived in the same area, so she drove to his mother's house and unsuccessfully tried to reach defendant by phone and by text. Defendant subsequently called her back, gave her the address and told her to park on the side of the building in an alley. Shortly after Gross arrived, defendant came downstairs carrying a large television, which he placed in the back seat, then returned again with garbage bags of clothes and shoes that he placed in the trunk. Defendant returned a third time with some other items, and when they arrived at Gross's apartment, she noticed that he had two televisions, one large and one small. Defendant had only ever previously mentioned having a single television at the victim's house. Gross noticed that defendant was extremely wet on his face, neck and shirt as he moved things from the victim's

apartment. Gross never saw or heard the victim while she waited for defendant and never saw anyone else in the alley. Gross stated that defendant was unusually quiet that night when they arrived back at her apartment and remained that way for days afterward.

¶ 23     Gross testified that on August 6, 2018, her stomach was hurting and she was scared. She clarified that defendant had been acting strange for a few days prior, and after receiving a phone call, defendant threw the phone down and told her that the victim was found dead in her apartment. Gross stated that she felt sick to her stomach and started crying. She also noted that a strange phone had "popped up mysteriously" at her house and it did not seem right. Gross stated that defendant brought the phone home with him and told her that someone lost it and he was going to return it. Gross asked defendant about that phone on August 6, 2018, and he said, "what phone?" Gross stated that she took her children to school and then went to work, but detectives came to her job and she went back home at approximately 10 a.m. to get some clothes and went to a family member's house. When she arrived home, defendant returned five minutes afterwards and told her that detectives were coming upstairs to speak with him. The detectives videoed the talk, asking them their names and speaking to defendant. Gross identified the video in court and said that the television referenced in the video was the one that defendant brought from the victim's apartment. She further testified that on August 2, 2018, when she returned from work there were groceries in her home that she did not purchase and to her knowledge defendant did not have a Link card in his name. Gross also identified a text message from defendant a few days after August 1, 2018, stating that his shoulder came out at work and he put it back in but they tried to make him go to the hospital. A few weeks thereafter, Gross moved to Colorado  and defendant later visited her there. Gross never moved back to Chicago and left defendant in the apartment.

¶ 24    On cross-examination, Gross confirmed that defendant and the victim were broken up, that they had previously lived together, and that he still had some of things at the victim's house. Gross eventually moved to Kentucky with her children and defendant joined her there until December 2019.

¶ 25    On redirect, Gross stated that the television was not in a box when he brought it downstairs and he was already sweaty when he brought the television down. The State asked Gross why she moved to Colorado and defendant objected. The trial court asked the basis when the defense introduced the subject and defendant indicated relevance, which was overruled. Gross subsequently stated that she moved to Colorado because her mother was there and neither she nor her mother thought it was safe for her to be in Chicago around defendant at that time. Gross stated that she let defendant move to Kentucky with her because he was released and she started thinking that maybe he would not do something like that.

¶ 26    Carmen Polk testified that she was the victim's best friend and lived three blocks away from her in August 2018. She had known the victim for two years prior. Polk testified regarding events on August 1, 2018, indicating that the victim called her and asked her to come down to her place while defendant was there getting his things. Polk stated that the victim wanted defendant to get his clothes and return her key. Polk testified that the victim and defendant were arguing about him lying about dating Whitney and social media posts he made. The victim had sent Polk pictures, social posts and text messages from defendant on July 31, 2018, about him and Whitney. Polk arrived at the victim's apartment on August 1, 2018, at approximately 11 a.m. or noon. Polk testified about the large television set that was present in the victim's living room. The victim told her that defendant wanted her television but he was not going to get it and was going to leave with

the small television that he came with, which was why the victim wanted Polk to be present. There was no objection to this testimony. The victim stated that she did not want defendant to be in her apartment when she was not there and she would not be there the following day because of a funeral. The victim also told Polk that defendant wanted her Link card but she was not going to give it to him, although she was ok with making food for him to eat. The victim believed that defendant was living with Whitney and getting engaged to her while still dating the victim, and she wanted Polk to record them as proof that they were still dating. After arriving at the victim's apartment, she and Polk were drinking and listening to music from the television and defendant arrived around 3:30 p.m. Defendant had a drink and they also smoked marijuana, while Polk recorded them and posted the video to social media. The victim and defendant argued the whole time and eventually Polk left at approximately 4:30 p.m. After arriving home, Polk called the victim to let her know that she had made it home. Polk went to sleep and woke up at 6:30 p.m. looking for her marijuana and called the victim to see if she left it there but got no answer. Polk eventually found it and texted the victim to let her know but got no response. She took her children to the movies and unsuccessfully tried to reach the victim on the way back and after she made it home, because they had planned to hang out. Polk called and texted the victim, and went by her house. She received a text back that the victim was at defendant's mother's house. Polk went to the store and returned to the victim's house, again ringing the bell and attempting to reach her on the phone before returning home to make more calls and texting the victim that she was rude for not answering. Polk later saw a Facebook post that was made on the victim's page and thought it was weird but left it alone. The next morning, she and the victim were supposed to go to a friend's funeral, but the victim never showed up. Polk identified the large television in photographs and

said that it was the television that the victim bought with her income tax which defendant wanted but she was not going to give it to him. No objection was made to this testimony.

¶ 27    Various law enforcement officers and the medical examiner provided graphic testimony regarding the state of the victim's body when it was discovered, namely the severe decomposition which made it difficult to precisely pinpoint the manner or time of death. The medical examiner also testified concerning DNA evidence that was sampled from the ligatures and the victim's body. Law enforcement also testified about the course of its investigation and evidence presented by the State that linked defendant to the victim's murder.

¶ 28    After closing arguments, the jury returned a guilty verdict for first degree murder and after ruling on defendant's posttrial motion for new trial, the trial court sentenced defendant to a 40-year prison term on November 1, 2023. Defendant's timely notice of appeal was filed on November 3, 2023.

¶ 29                                          ANALYSIS

¶ 30    On appeal, defendant contends that: (1) the trial court denied him a fair trial by allowing the State to present unfairly prejudicial other crimes strangulation evidence and the victim's hearsay statements about the big screen television that defendant removed from her apartment with his other belongings; (2) the State's numerous improper closing arguments denied him a fair trial; and (3) the cumulative errors deprived defendant of a fair trial. We shall review each issue in turn.

¶ 31                              A. Other Crimes Evidence

¶ 32    Defendant first contends that the trial court denied him a fair trial by allowing the State to present unfairly prejudicial other crimes strangulation evidence and the victim's hearsay statements about the big screen television that defendant removed from her apartment with his

other belongings. Specifically, defendant argues that the court's ruling was erroneous because the Mother's Day incident was not probative of his motive or intent in this case and because the risk of unfair prejudice substantially outweighed the incident's probative value as propensity evidence.

¶ 33    He noted that the trial court's finding that the Mother's Day incident was relevant as proof of defendant's motive and intent was wrong because it misunderstood the definitions of motive and intent. Defendant asserts that perhaps the Mother's Day incident would have gone to proof of motive in the present case if the victim, her mother or anyone else had called the police and charges were filed against him for the incident. Because that did not happen, defendant argues that there was not even a "superficial motive" for him to commit a new act of violence against the victim, much less to kill her months later as he moved out of her home and to Gross'.

¶ 34    With respect to intent, defendant contends that the Mother's Day incident was irrelevant as proof of his intent to kill the victim and the fact that he purportedly strangled the victim on another occasion had no bearing on that question. Thus, he maintains that the trial court erred by admitting the Mother's Day incident as evidence of his intent and motive.

¶ 35    Defendant further contends that although the Mother's Day incident satisfied the threshold criteria for admissibility, the evidence should have been barred due to the risk of unfair prejudice it posed to defendant in this circumstantial case. He argues that finding that the Mother's Day incident and the victim's death had strangulation in common presupposed that the victim actually died due to strangulation, wherein  her cause of death was inconclusive at trial. Thus, the probative value of the Mother's Day incident is lessened which, in turn reduces the probative value of the Mother's Day evidence for explaining the victim's death.

¶ 36    Defendant argues that the State capitalized on this error by making the evidence central to its theory of the case and arguments, and because the trial evidence was otherwise not so overwhelming that there was no reasonable probability of a different outcome anyway, those errors were not harmless. Defendant maintains that this court should reverse and remand for a new trial.

¶ 37    We note that the other-crimes evidence was admitted as a result of the State's pretrial motion *in limine*, which the trial court partially granted. In its amended motion to allow other crimes evidence, the State noted that it intended to call Gross, defendant's ex-girlfriend who had previously met the victim' on Mother's Day 2018. During the section of the motion related its intention to call Gross to testify, the State noted that the victim's mother, Boler, was also present for the incident between Gross and the victim and that the State intended to call Boler to discuss the remainder of the incident, specifically the choking. The amended motion noted that defendant admitted to the verbal arguments and the people that were present for the Mother's Day incident and that he shoved the victim but denied choking her. The State also noted that the incident was not reported.

¶ 38    In his written response to the amended motion, defendant argued that it would be error to allow the victim's mother to testify regarding the incident because the State only proffered that this alleged incident occurred in front of several family members but did not indicate that the victim's mother was one of them nor name who else was allegedly present, and there was no police report. He concluded that admission of the alleged incident would be more prejudicial than probative because there was no proof of it and its admission would deny him a fair trial. Defendant went on to make general arguments against the other crimes evidence as a whole but specifically argued throughout his response that 'there [was] no evidence that [the victim] was choked or that

a domestic violent altercation occurred prior to her death" and that admission would create a narrative not based on any evidence." Thus, defendant argued in his objection to the State's motion that the error in allowing the victim's mother to testify was based on a lack of proof of the incident. Defendant's counsel also made the same arguments at the hearing on the State's motion regarding the Mother's Day 2018 purported incident.

¶ 39    The record reveals that the trial court partially granted the State's motion *in limine* to admit evidence of defendant's prior assaults on former romantic partners under similar circumstances- an argument followed by defendant either choking or punching his romantic partner. The trial court found that the evidence was relevant and admissible as proof of propensity, motive, and intent, and that the probative value of the evidence was not outweighed by the danger of unfair prejudice to defendant.

¶ 40    However, the State ultimately did not introduce such evidence at trial. Rather, the State only introduced evidence at trial of defendant's purported prior assault on the victim almost three months prior to her death, namely, an argument followed by defendant choking the victim. This evidence was presented through the testimony of the victim's mother, Boler, without further objection by defendant.

¶ 41    Other-crimes evidence is generally inadmissible to demonstrate propensity to commit the charged crime, but is admissible to prove intent, motive, *modus operandi*, identity, absence of mistake, or any relevant fact other than propensity. *People v. Nash*, 2013 IL App (1st) 113366, ¶ 15. Also, notwithstanding the general prohibition on other-crimes evidence being admitted to show the defendant's character or propensity to commit crime, such evidence is admissible to prove

character or propensity as provided in sections 115-7.3, 115-7.4, and 115-20 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3, 115-7.4, 115-20 (West 2022)).

¶ 42    Even where evidence is otherwise admissible, the trial court can exclude the evidence where the probative value is substantially outweighed by the danger of unfair prejudice to a defendant. *Nash*, 2013 IL App (1st) 113366, ¶ 15. Further, even if other-crimes evidence is relevant, it must not become the focal point of the trial, and the trial court should prevent a "mini-trial" of a collateral offense. *People v. Hale*, 2012 IL App (1st) 103537, ¶ 24. Evidence that is relevant and otherwise admissible should not be excluded because it may also tend to prejudice the accused. *Hale*, 2012 IL App (1st) 103537, ¶ 35. Rather, courts should only exclude such evidence- including evidence of other crimes- if its prejudicial effect substantially outweighs its probative value. *Id*. Evidence has been defined as being unduly or unfairly prejudicial when it has an undue tendency to suggest decision on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror. *Id*. The danger of unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged. *Id.*

¶ 43    The determination of whether evidence of other crimes is relevant to a material issue and whether its probative value outweighs its prejudicial effect is in the sound discretion of the trial court. *Id*. Moreover, a trial court's decision to admit other-crimes evidence will not be reversed on appeal, unless the court abused its discretion. *People v. Ross*, 2018 IL App (2d) 161079, ¶ 163. A trial court abuses its discretion only when its ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would adopt the view of the trial court. *Hale*, 2012 IL App (1st) 103537, ¶ 10.

¶ 44       As noted above, the record reveals that the trial court partially granted the State's motion *in limine* to admit evidence of defendant's prior assaults on former romantic partners under similar circumstances- an argument followed by defendant either choking or punching his romantic partner. The principle that prior assaults against a victim of a crime that defendant is charged with committing is probative of intent or motive is well established. *Nash*, 2013 IL App (1st) 113366, ¶ 18. Where other-crimes evidence is offered it is admissible only where the other crime bears some threshold similarity to the crime charged. *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 153.

¶ 45       Here, we find that the proffered evidence showed parallel behavior in situations where defendant had disagreements with romantic partners that turned violent. The trial court found that such evidence was relevant and admissible of proof of propensity, motive and intent, and that the probative value of the evidence was not outweighed by the danger of unfair prejudice to defendant. We agree that the other-crimes evidence was relevant and probative of the disputed issue of whether defendant used violence against the victim after a disagreement. See *People v. Boand*, 362 Ill. App. 3d 106, 123-24 (2005); *People v. Hale*, 2012 IL App (1st) 103537, ¶ 33 (the probative value of the evidence of the earlier incident substantially outweighs its risk to cause unfair prejudice). We thus conclude that the trial court did not abuse its discretion in allowing the other-crimes evidence related to the Mother's Day 2018 incident.

¶ 46       In a related issue, defendant contends that the trial court erred in denying his motion *in limine* to bar the victim's hearsay statements that she owned the big screen television in the apartment she shared with defendant and that she wanted to prevent defendant from taking it. Defendant argues that the State used the proffered testimony to prove the truth of the matter

asserted, which made it hearsay; the state of mind hearsay rule did not apply because the State used the victim's statements to prove defendant's state of mind, which is forbidden by the rule; and no other hearsay exception applied that would have made the statements admissible. Defendant contends that the trial court should have granted his motion *in limine* to bar this evidence.

¶ 47   In response to defendant's pretrial motion *in limine*, the State argued that it was not offering the statements for the truth of the matter asserted; rather, it was offering the statements to show motive. The State contended that the actual ownership of the television was irrelevant because it only mattered that the victim believed that she owned the television to support its theory of motive

¶ 48   Hearsay denotes a statement made by an out-of-court declarant that is offered to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). The rule against hearsay prevents the introduction at trial of out-of-court statements offered to prove the truth of the matter asserted. *People v. Melchor*, 376 Ill. App. 3d 444, 450 (2007).

¶ 49   After a careful review of the proffered statements and the trial court's ruling, we disagree with defendant's characterization of the statements as hearsay. The statements at issue were introduced at trial by Boler and Polk regarding the victim's statements about ownership of the television, not the truth of the matter asserted. Boler testified that the victim had purchased the large television with her income tax refund money, that the victim loved the television and referred to it as her "baby," and that the television was missing on the day she discovered the victim's body. Polk testified that the victim bought the television with her income tax refund money and further that the victim asked her to come over on the day that defendant was coming to get the rest of his belongings to presumably help the victim prevent defendant from taking the television. Polk also

testified that the television was present while she was at the apartment on August 1, 2018. We agree with the trial court that the statements fall into the category of statements about a dispute as to ownership of the television which was a source of conflict with defendant. We agree with the State that these statements need not be factually true to support the State's theory of motive. All that mattered was whether the victim's beliefs that she owned the television and that defendant would try and take the television were sufficient to lead to confrontation. This court has previously found that these types of underlying fact-based statements are not offered for their truth. *People v. Buschauer*, 2022 IL App (1st) 192472, ¶ 85. See also *People v. Moss*, 205 Ill. 2d 139 (2001); *People v. Coleman*, 2014 IL App (5th) 110274 (engaged in the factual analysis of whether the statements were offered to prove motive or for their truth). Accordingly, we find that defendant's contention is without merit and the trial court did not abuse its discretion in allowing the victim's statements concerning ownership of the television.

¶ 50                                    B. Improper Closing Argument

¶ 51    Defendant next contends that the State's numerous closing arguments deprived him of a fair trial. Specifically, defendant takes issue with the following category of statements during the State's closing: (1) the dirt ring in the bathtub; (2) when the victim's cell phone stopped interacting with the cellular network; (3) how the State wished the jurors could have met the victim; (4) the victim's mother's and best friend's feelings of regret; and (5) where defendant was on August 6, 2018, when the victim's phone again interacted with the network. Defendant argues that these arguments were inappropriate because they misstated the evidence, were not based on reasonable inferences from the evidence or were relevant only to encourage the jury to sympathize with the victim and her family and to "revile" defendant. He further contends that, "in this circumstantial

- 21 -

case, in which, *inter alia*, another man's DNA was recovered from [the victim]'s vagina and underneath her left-hand fingernails days later, these errors were not harmless, thus this case should be reversed and remanded for a new trial.

¶ 52    The purpose of closing arguments is to provide the parties with a final opportunity before the jury to review the admitted evidence, to explain the relevant law, and to assert why the evidence and the law compel a favorable verdict. *People v. Williams*, 2022 IL 126918, ¶ 40. An error in closing argument is not a typical trial error in that it does not involve the admission of inculpatory evidence or the rejection of exculpatory evidence but rather commentary on the evidence that has been presented. *Id.* That is why juries are told that closing arguments are not evidence and "any statement or argument made by the attorneys which is not based on the evidence should be disregarded." *Id.* (quoting, Illinois Pattern Jury Instructions, Criminal, No. 1.03 (2011)).

¶ 53    Prosecutors are afforded wide latitude during closing argument and may properly comment on the evidence presented and reasonable inferences drawn from that evidence, respond to comments made by defense counsel that invite a response, and comment on the credibility of a witness. *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 47. This is so even if those inferences reflect negatively on the defendant. *Williams*, 2022 IL 126918, ¶ 44. However, a prosecutor may not personally vouch for the credibility of a witness or bolster a witness's testimony. *Marzonie*, 2018 IL App (4th) 160107, ¶ 47. It is also improper for a prosecutor to misstate the evidence or argue facts not in evidence. *Id.* To determine whether a prosecutor's comment in closing argument was improper, a reviewing court must view such comment in its proper context. *Id.*

¶ 54    Improper remarks during closing argument are reversible error only when they cause substantial prejudice to the defendant. *Id.* ¶ 48. Substantial prejudice occurs if the improper

remarks were a material factor in the defendant's conviction. *Id.* Improper remarks are a material factor if (1) the jury could have reached a contrary verdict had the improper remarks not been made or (2) the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction. *Id.* The strength of the evidence offered against a defendant is often a decisive factor when determining whether the improper statements were a material factor in his conviction. *Id.* Such comments should be considered in the context of the entire closing argument, as well as the trial court's instructions that arguments are not evidence, that the State bears the burden of proving the defendant's guilt beyond a reasonable doubt, and that the defendant need not present any evidence. *Williams*, 2022 IL 126918, ¶ 44. A trial court's decision to overrule an objection to a comment in prosecutorial closing argument will not be overturned absent an abuse of discretion. *Id.* ¶ 41.

¶ 55    In response, the State counters that the claimed erroneous statements were merely comments on the evidence and reasonable inferences that arose from it and were not improper. Additionally, the State argues that the rebuttal comments were provoked or invited by defense counsel's closing argument and were not improper.

¶ 56    The record indicates that prior to closing arguments, the trial court admonished the jury about closing arguments, specifically that what the lawyers say is not evidence and if any statements made are not based on the evidence or reasonable inferences from the evidence, those statements should be disregarded. The closing arguments in this case were very lengthy; the State's opening spanned 34 pages, the defendant's closing argument was 19 pages long and the State's rebuttal argument was 22 pages long.

¶ 57    Upon review of the entire 75 pages of closing argument contained in the record, we reject defendant's contention that the complained-of remarks constituted prosecutorial misconduct or deprived defendant of a fair trial. Two of the complained-of comments occurred during the State's opening argument. First, the comment about the dirt ring around the bathtub where the victim's body was found which the State said implied that there was water in the tub with the body at some point. Defense counsel objected and the trial court overruled the objection and admonished the jury that arguments were not evidence. The second comment was related to when the victim's phone stopped interacting with the network. Defense counsel objected and the trial court overruled the objection. We find that the State's comment was a proper inference from the testimony and documentary evidence presented at trial that there was no activity on the victim's phone between August 1 and August 6, 2018.

¶ 58    The next three complained-of comments occurred during the State's rebuttal argument. The first comment was when the State told the jury that it would have been great if the jury could have met the victim but would have to rely on the videos in evidence. Defense counsel objected and the trial court overruled the objection. Defendant contends that this comment was an improper emotional appeal. We disagree. In a murder case, it is understood that the victim is deceased and would not be present at trial in front of the jury, so it is difficult to see how indicating that the victim is deceased would be an emotional appeal. Moreover, this court has previously held that there is no requirement that the prosecutor give an argument without any emotion and given the brutal facts of this case, it would likely be difficult for the State to give a closing argument without some element of emotion. *People v. Beltran*, 2011 IL App (2d) 090856, ¶ 68. That being said, a prosecutor should not give a closing argument in such an emotional way that it serves to inflame

the passions of the jury and prejudice the defendant. *Id.* However, based on the record before us, we cannot say that defendant was prejudiced by the State's comments stating the obvious, that the victim was no longer with us.

¶ 59    The other two comments that defendant challenges in the State's rebuttal were related to comments on regret by the victim's mom and best friend, and defendant's whereabouts when the victim's phone pinged on August 6, 2018. Based on our review of the entire closing arguments of both parties, we find that these comments were directly invited by the defendant during his closing argument. With respect to the comments about the regrets of Boler and Polk, the record reveals that defendant's closing argument dismissed the concerns of the victim's mother and friend about the victim's well-being. Defendant argued that Boler was not concerned about the Mother's Day 2018 choking incident because she did not call the police. Defendant also argued that Polk was not concerned about the victim's well-being on August 1, 2018, because she left her there with defendant and although she went back to the apartment and called the victim several times that night, she did not call the next day or try to enter the building at any time. Additionally, defendant's closing arguments regarding defendant's whereabouts on August 6, 2018, when the victim's phone was turned on, spanned three pages of his closing argument. During rebuttal, the State may respond to statements made by defense counsel in closing argument that invite a response and we consider comments in the proper context by examining the entire closing argument of both sides. *People v. Thompson*, 2015 IL App (1st) 122265, ¶ 39. It is clear from our review of the record that the State's comments in rebuttal were invited by the defendant, and he cannot now claim unfair prejudice. The trial court did not abuse its discretion in overruling defendant's objections to the complained-of comments.

¶ 60                              C. Cumulative Error

¶ 61     Finally, defendant contends that the issues raised in this appeal constitute cumulative errors that deprived him of a fair trial. However, since we have decided those individual issues in the affirmative, we necessarily conclude that defendant was not deprived of a fair trial.

¶ 62                              CONCLUSION

¶ 63     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 64     Affirmed.